Evelyn RANDALL, Emma Matthews, Archie Morse, Minnie Miller, by her next friend, Viola Liskey, on behalf of themselves and all others similarly situated, and Maggie Lamb, Pompey Wingo, Rachel Wingo and William E. Smith, Appellees,

v.

William L. LUKHARD, Comm. of the Commonwealth of VA Dept. of Welfare, Dr. James B. Kenley, Comm. of Health for the Commonwealth of VA, and Dr. Freeman C. Hays, Dir. of VA Medical Assistance Program, Appellants,

and

Richard Schweiker, Sec. H & H Services, Amicus Curiae.

Evelyn RANDALL, Emma Matthews, Archie Morse, Minnie Miller, by her next friend, Viola Liskey, on behalf of themselves and all others similarly situated, and Maggie Lamb, Pompey Wingo, Rachel Wingo and William E. Smith, Appellants,

v.

William L. LUKHARD, Comm. of the Commonwealth of VA Dept. of Welfare, Dr. James B. Kenley, Comm. of Health for the Commonwealth of VA and Dr. Freeman C. Hays, Dir. of VA Medical Assistance Program, Appellees,

and

Richard Schweiker, Sec. H & H Services, Defendant.

Nos. 82–1773, 82–1774.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 7, 1983.

Decided June 8, 1983.

John P. Alderman, U.S. Atty., E. Montgomery Tucker, Asst. U.S. Atty., Roanoke, Va., Diane C. Moskal, Regional Atty., Dept. of Health and Human Services, Philadelphia, Pa., David R. Smith, Dept. of Health and Human Services, Washington, D.C., on brief, for amicus curiae.

Before WINTER, Chief Judge, RUSSELL, Circuit Judge, and FAIRCHILD,* Senior Circuit Judge.

## HARRISON L. WINTER, Chief Judge:

Before us are challenges to the Virginia Medicaid program's former and current "transfer of assets" eligibility rules, as applied to Medicaid applicants and recipients from April 24, 1978 through the present. These rules direct that an individual who transfers property for less than its fair market value, in order to become or remain eligible for Medicaid, is to be denied such assistance for a specified period of time.

Summarizing our conclusions, we agree with the district court that the former rule violated federal law and affirm, among others, that part of the district court's order, 536 F.Supp. 723, requiring that persons denied assistance under the former rule be given notice of this judgment, although we require that the content of the notice be modified. We reverse in part the district court's determination that the new rule is in all respects lawful; we think that it imposes an excessive burden of proof on persons attempting to demonstrate that their transfers were made for permissible reasons. We affirm the validity of the remainder of the new rule. We also reverse the district court's ruling that the new rule may not lawfully be applied to persons whose initial applications for assistance were filed prior to July 1, 1981. We think that the new rule may be applied to initial eligibility determinations made on or after July 1, 1981, even if the application was filed prior to that date, and to any eligibili-

Herbert L. Beskin, Charlottesville-Albemarle Legal Aid Society, Charlottesville, Va. (V. Anne Edenfield, Legal Aid Society of Roanoke Valley, Roanoke, Va., on brief), for appellants in 82–1774 and for appellees in 82–1773.

Robert T. Adams, Asst. Atty. Gen., Richmond, Va. (John A. Rupp, Senior Asst. Atty. Gen., Gerald L. Baliles, Atty. Gen., Richmond, Va., on brief), for appellants in 82–1773 and for appellees in 82–1774.

* Hon. Thomas E. Fairchild, Senior United States Circuit Judge for the Seventh Circuit, sitting by designation.

ty redetermination occurring on or after July 1, 1981. We therefore reverse the district court's order granting relief to these individuals.

### I.

The history of the Medicaid program and its provisions under which the present case arose were reviewed by the Supreme Court in *Schweiker v. Gray Panthers,* 453 U.S. 34, 36–39, 101 S.Ct. 2633, 2636–2637, 69 L.Ed.2d 460 (1981). As noted there, the Medicaid program was established in 1965 to "provid[e] federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." *Id.* at 36, 101 S.Ct. at 2636, quoting *Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). Each participating state was required to have a plan for determining the eligibility of individuals seeking medical assistance. 42 U.S.C. § 1396a(a). The criteria for eligibility included a maximum level of income and resources. Relevant to that determination, the state plan was required to "include reasonable standards ... which ... provide for taking into account only such income and resources as are, as determined in accordance with standards prescribed by the Secretary, available to the applicant or recipient." *Id.* § 1396a(a)(17). The Secretary's regulations in effect on January 1, 1972 provided that the state plan must "[p]rovide that only such income and resources as are *actually available* will be considered." 45 C.F.R. § 248.21(a)(2)(i) (1972) (emphasis added).[1]

As Medicaid was originally enacted, participating states were required to provide medical assistance only to those persons eligible to receive categorical assistance under one of four welfare programs established elsewhere in the Social Security Act. 42 U.S.C. § 1396a(a)(10) (1970). Effective January 1, 1974, however, Congress replaced three of the four categorical assistance programs with the Supplementary Security Income ("SSI") program. 42 U.S.C. § 1381 *et seq.* Under the new program, the federal government assumed the responsibility for defining standards of eligibility for categorical (now SSI) assistance theretofore borne by the states. *Id.* § 1382. The new federal standards expanded the class of individuals eligible to receive such assistance, and hence threatened to expand Medicaid eligibility, which under the Social Security Act was linked coterminously with SSI eligibility. *Id.* § 1396a(a)(10). Congress feared that many states would withdraw entirely from the Medicaid program rather than expand their coverage and resultant obligations. Therefore, "in order not to impose a substantial burden on these states," S.Rep. No. 93–553, 93d Cong., 1st Sess. 56 (1973), or discourage them from participating, Congress offered the states the "§ 209(b) option." Under this option, a state may choose to provide medical assistance only to those individuals who would have been eligible to receive assistance under the state Medicaid plan in effect on January 1, 1972. 42 U.S.C. § 1396a(f).[2] Virginia elected to exercise the § 209(b) option, and therefore at all relevant times has limited medical assistance to those individuals who would have been eligible under the Virginia plan in effect on January 1, 1972.

Virginia had its former transfer of assets rule in effect on January 1, 1972. As of

---

**1.** The text of 45 C.F.R. § 248.21(a)(2)(i) (1972) was:

> Financial eligibility—medical assistance programs.
> (a) *State plan requirements.* A State plan under title XIX of the Social Security Act must: ... (2) With respect to both the categorically needy and, if they are included in the plan, the medically needy:
> (i) provide that only such income and resources as are actually available will be considered ....

**2.** 42 U.S.C. § 1396a(f) provides:

> Notwithstanding any other provision of this subchapter, ... no State ... shall be required to provide medical assistance to any aged, blind or disabled individual ... for any month unless such State would be (or would have been) required to provide medical assistance to such individual for such month had its plan for medical assistance approved under this subchapter and in effect on January 1, 1972, been in effect in such month ....

that date, the rule provided that a Medicaid applicant or recipient would be ineligible for benefits for a period of one year if he had transferred property for less than its fair market value within one year of the date of application or while receiving benefits,[3] and such transfer was made in order to become or remain eligible for Medicaid.[4]

Plaintiffs filed the present action on April 24, 1980, seeking, under 42 U.S.C. § 1983, a declaration that the Virginia rule was inconsistent with the Social Security Act, an injunction against further enforcement of the rule, and the reinstatement to eligibility of persons denied assistance because of the rule.

In December of 1980, however, the Boren-Long Amendment to the Social Security Act was signed into law. Pub.L. No. 96–611, § 5, 94 Stat. 3567 (1980), codified at 42 U.S.C. §§ 1382b(c) and 1396a(j).[5] The Amendment authorized state Medicaid plans to employ a transfer of assets rule providing for the inclusion in an applicant's resources of any property transferred for less than its full value within the preceding

---

3. In Virginia, Medicaid eligibility is routinely redetermined every twelve months, leading to application of the transfer of assets rule to individuals who transfer assets lest their improved financial condition disqualify them from continued assistance.

4. The full text of the rule, as of January 1, 1972, read:

An applicant for or recipient of medicaid as a recipient of SSI or a category related to a medically needy individual is ineligible for a period of one year if he transfers or otherwise disposes of his legal or equitable interest in real or personal property within one year prior to application or during receipt of such assistance to become or remain eligible for Medicaid. The transfer or disposal of such property to become or remain eligible for SSI is considered as if the transfer or disposal is to become or remain eligible for Medicaid.

Exceptions to this provision are: (1) when property has been transferred that would have no effect on eligibility except a residence when an individual is in a nursing home for a temporary period; (2) when payment has been made approximating the tax value of the property; (3) when payment has been made on the cost of medical care approximating the tax value of the property; or (4) when the property owner has been a victim of actions on the part of another person who for any reason obtained the property without the applicant's/recipient's full understanding of the action.

Virginia State Dep't. of Welfare Medicaid Manual §§ 201.1A.3(2), 301.1(D)(3), and 402.-1(B)(3).

5. 42 U.S.C. § 1382b(c), establishing a transfer of assets rule for SSI eligibility, provides:

(c)(1) In determining the resources of an individual (and his eligible spouse, if any) there shall be included (but subject to the exclusions under subsection (a) of this section) any resource (or interest therein) owned by such individual or eligible spouse within the preceding 24 months if such individual or eligible spouse gave away or sold such resource or interest at less than fair market value of such resource or interest for the purpose of establishing eligibility for benefits or assistance under this chapter.

(2) Any transaction described in paragraph (1) shall be presumed to have been for the purpose of establishing eligibility for benefits or assistance under this chapter unless such individual or eligible spouse furnishes convincing evidence to establish that the transaction was exclusively for some other purpose.

(3) For purpose of paragraph (1) the value of such a resource or interest shall be the fair market value of such resource or interest at the time it was sold or given away, less the amount of compensation received for such resource or interest, if any.

42 U.S.C. § 1396a(j), establishing a transfer of assets rule for Medicaid plans, provides:

(j)(1) Notwithstanding any other provision of this subchapter, an individual who would otherwise be eligible for medical assistance under the State plan approved under this subchapter may be denied such assistance if such individual would not be eligible for such medical assistance but for the fact that he disposed of resources for less than fair market value. If the State plan provides for the denial of such assistance by reason of such disposal of resources, the State plan shall specify a procedure for implementing such denial which, except as provided in paragraph (2), is not more restrictive than the procedure specified in section 1382b(c) of this title.

(2) In any case where the uncompensated value of disposed of resources exceeds $12,-000, the State plan may provide for a period of ineligibility which exceeds 24 months. If a State plan provides for a period of ineligibility exceeding 24 months, such plan shall provide for the period of ineligibility to bear a reasonable relationship to such uncompensated value.

twenty-four months in order for the transferor to become or remain eligible for assistance. 42 U.S.C. §§ 1382b(c)(1), 1396a(j)(1). The amendment also authorized § 209(b) states to provide for a specified period of ineligibility in excess of twenty-four months where the amount of uncompensated value exceeded $12,000, rather than providing for inclusion in the person's resources of the uncompensated amount. *Id.* § 1396a(j)(2). In § 209(b) states, however, the state plans containing a transfer of assets disqualification were required to specify a procedure that otherwise is "not more restrictive" than that specified for the SSI transfer of assets rule in 42 U.S.C. § 1382b(c). *See id.* § 1396a(j)(1). In particular, that procedure requires the transferor to furnish "convincing evidence" that the transaction was exclusively for a purpose other than establishing eligibility for assistance. *Id.* § 1382b(c)(2).

Virginia amended its rule, effective July 1, 1981, in order to conform to Boren-Long.[6] Under the new Virginia rule, an applicant is ineligible for a specified period of time if he has transferred property for less than fair market value within the preceding two years, or, for a recipient, within two years of the discovery of that transfer. The period of ineligibility is specified as two years from the date of the transfer, plus an additional two months for every $1,000 or part thereof in uncompensated value in excess of $12,000. The new rule provides that the burden is on the client to demonstrate, by objective evidence and not merely a subjective statement of intent or ignorance, that the transfer was not made in an effort to qualify for Medicaid. The client must "provide evidence that other resources were available, at the time of transfer, to meet current and expected needs of that client, including costs of nursing home care."

Plaintiffs then amended their complaint by adding two challenges to the new rule. First, they sought an injunction against its application to persons filing their initial Medicaid applications on or after July 1, 1981, the effective date of Boren-Long. Second, they sought an injunction against application of the new rule to persons whose initial applications had been filed but not yet been acted upon before that date or whose eligibility was being redetermined on or after that date.

The district court certified three plaintiff classes: (1) persons who applied for Medicaid from April 24, 1978[7] through June 30,

(3) ....

6. Virginia's new rule provides, in relevant part: *Property Transfer*—Any applicant for Medicaid benefits is ineligible for a specified period of time if he/she improperly transfers or otherwise disposes of his/her legal or equitable interest in real or personal property without adequate compensation within two years prior to application for assistance. A recipient of Medicaid benefits is ineligible for a specified period of time if he/she improperly transfers or otherwise disposes of his/her legal or equitable interest in real or personal property within two years of the discovery of that transfer. Such a transfer of property will result in the ineligibility of the assistance unit for two years from the date of transfer if the uncompensated value was $12,000 or less. The period of ineligibility will be increased two months for every $1,000 or part thereof of uncompensated value in excess of $12,000. The amount of the uncompensated value is the fair market value of the property, established for local tax purposes, less the amount of any compensation received for the property. Exceptions to this provision occur when:

a. A transfer of property is not made in an effort to become or remain eligible for Medicaid or SSI. It will be the responsibility of the client to establish that such a transfer was not made in an effort to qualify for Medicaid or SSI. The client must provide objective evidence that the transfer was exclusively for another purpose. A subjective statement of intent or ignorance of the property transfer provision is not sufficient. The client must provide evidence that other resources were available, at the time of transfer, to meet current and expected needs of that client, including costs of nursing home care.

Virginia State Dep't of Welfare Medicaid Manual §§ 301.1(D)(3) and 402.1(B)(3) (1981).

7. The district court employed this date because it is two years prior to the date the lawsuit was filed, and 42 U.S.C. § 1983 has a two-year statute of limitations. We think it clear, however, that the date that plaintiffs' cause of action arose was the date that final unfavorable administrative action was taken; not the date that initial applications for assistance were filed. *See Bireline v. Seagondollar*, 567 F.2d 260, 263 (4 Cir.1977) (the "federal rule estab-

1981 and were denied assistance because of transfers made before July 1, 1979 [i.e., persons to whom the former rule had been applied]; (2) persons who applied from April 24, 1978 through June 30, 1981 and were denied assistance because of transfers made on or after July 1, 1979 [i.e., persons who initially applied under the former rule but to whom the new rule had been applied [8]]; and (3) persons who applied on or after July 1, 1981 and were denied assistance because of transfers made on or after July 1, 1979 [i.e., persons who applied under, and were denied assistance because of, the new rule].

The district court decided that the former rule, as it had been applied to the first class, had violated the Supremacy Clause by conflicting with the Social Security Act and HEW regulations requiring states to include only those resources "actually available" to the applicants and recipients. The court also decided that the new rule, although lawful as applied to the third class (i.e., persons who initially applied for Medicaid on or after July 1, 1981), could not be applied at all to any person whose initial application had been filed prior to July 1, 1981 (i.e., the second class). The district

court ordered the state to cease such application of the new rule, to restore to eligibility all members of the first and second classes who now meet all other applicable eligibility criteria, and to send notices to all members of the first and second classes that their federal rights had been violated and that they might seek reimbursement for past expenses through state proceedings.[9]

The Commonwealth appeals from these orders, and plaintiffs appeal from the judgment that the new rule is valid as applied to the third class.

II.

We consider first the validity of Virginia's former transfer of assets rule. Under 42 U.S.C. § 1396a(a)(17), the state plan was required to take into account only such resources as were, in accordance with the Secretary's standards, "available" to the client. On January 1, 1972, the Secretary's standards required that such resources be "actually available." We agree with the district court that Virginia's former rule violated this plain language by including resources no longer "actually available" to the applicant or recipient.[10] It is apparent

---

lishes as the time of accrual that point in time when the plaintiff knows or has reason to know of the injury which is the basis of his action"), *cert. denied,* 444 U.S. 842, 100 S.Ct. 83, 62 L.Ed.2d 54 (1979). Moreover, the question of whether the date of accrual was tolled by the pursuit of administrative appeals was addressed in *Board of Regents v. Tomanio,* 446 U.S. 478, 483–86, 100 S.Ct. 1790, 1794–96, 64 L.Ed.2d 440 (1980). The Supreme Court there instructed that the question of whether pursuit of administrative remedies tolls the limitations period is to be determined by reference to state tolling law. Under Va.Code § 8.01–255, pecuniary claims against the state must first be presented to the Comptroller for administrative proceedings, and the statute of limitations for filing in state court runs only thereafter. We think that this indicates that Virginia intends that the limitations period for claims against the state be tolled by the pursuit of administrative remedies.

The district court is therefore instructed to expand the composition of the first and second classes so that they include all persons whose applications were filed prior to July 1, 1981 and finally, after any administrative proceedings, denied on or after April 24, 1978.

**8.** Some of these people may actually have been denied assistance under the former rule (e.g., they applied in March, 1981, after transferring assets in December, 1980), but because their transfers were made on or after July 1, 1979, they could have been denied assistance under operation of the new rule when it became effective on July 1, 1981.

**9.** The named plaintiffs who were representatives of the classes certified were also given individual relief. They were awarded reinstatement of Medicaid eligibility provided they demonstrated eligibility unrelated to the transfer of assets rule, the opportunity to present to welfare officials evidence of medical expenses which would have been paid under Virginia's Medicaid program but for application of the transfer rule, and access to the Virginia Medicaid program's administrative process or to any other administrative or judicial process if there are disputes as to whether and how much money they should be paid or reimbursed.

**10.** Several district courts have also reached this conclusion. *See McFarland v. Mitchell,* C.A. # C–80–0325 (D.Utah 1982); *Dokos v. Miller,* 517 F.Supp. 1039 (N.D.Ill.1981); *Wood-*

that resources that were previously irrevocably transferred to another person, regardless of the amount of compensation received, simply are no longer actually available. Moreover, the legislative history of the Act makes clear that Congress was concerned that only those resources "actually available" be counted. *See Gray Panthers,* 453 U.S. at 47 n. 17, 101 S.Ct. at 2642 n. 17.

The Commonwealth argues that, despite this plain language, its transfer of assets rule did not violate the Act's availability requirement. Specifically, Virginia urges that *Gray Panthers* held that "available" resources need not be "in hand." It is true that *Gray Panthers* did uphold the Secretary's regulations permitting the income of one spouse to be "deemed" as part of the income "available" to the other. But the Court's rationale in *Gray Panthers* was that, because of the extraordinary complexity of the Social Security Act, unusually great deference is to be accorded to the Secretary's regulations giving content and meaning to the Act and its terms. Indeed, the regulations deferred to in *Gray Panthers* were interpreting the precise part of 42 U.S.C. § 1396a(a)(17) at issue here. Moreover, the Court noted that "deeming" of spousal income was recognized in the Act and in the legislative history as being consistent with the requirement that only "available" or "actually available" income be counted.[11] There is no similar indication suggesting that Congress saw transfer of assets rules as being consistent with the availability requirement. Therefore, we think that *Gray Panthers* actually supports

the argument that we must give to the Secretary's regulation its plain meaning.

The Commonwealth also argues that the "actually available" regulation applies only to "financial eligibility" standards within state Medicaid plans, and not to fraud-deterring standards. We specifically rejected this argument in *Fabula v. Buck,* 598 F.2d 869, 873–74 (4 Cir.1979), where Maryland claimed that its transfer of assets rule was a collateral restriction to eliminate fraud, rather than a substantive eligibility requirement. The same reasoning employed there applies here.[12]

We hold, therefore, that on January 1, 1972, Virginia's transfer of assets rule conflicted with federal law and was invalid. As a § 209(b) state, Virginia was authorized, from January 1, 1974 onward, to use eligibility standards more restrictive than SSI only if they were contained in its plan in effect on January 1, 1972. 42 U.S.C. § 1396a(f). We interpret that limitation to mean that a § 209(b) state may use only those restrictions that were *lawfully and validly* part of its plan in effect on January 1, 1972. The Fifth Circuit, in reaching this conclusion, said in *Norman v. St. Clair,* 610 F.2d 1228, 1235 (5 Cir.1980), *cert. denied,* 453 U.S. 922, 101 S.Ct. 3159, 69 L.Ed.2d 1005 (1981):

Although § 209(b) allows states to use standards more restrictive than those under the SSI program, the provision can not be viewed as an all-purpose "grandfathering" clause which effectively legitimizes any and every provision appearing in a state plan in 1972. We find no indication that in passing § 209(b) Congress intended to authorize otherwise im-

*ward v. St. Clair,* C.A. # J78–0274(R) (S.D. Miss.1980).

11. *See* 453 U.S. at 44–48, 101 S.Ct. at 2640–2642. The Court cited § 1396a(a)(17)(D), which explicitly authorizes certain "deeming," as well as passages from both the House and Senate reports, which specifically indicate that "deeming" is authorized under the Act.

12. We also cannot agree that a state has the inherent authority to enact collateral eligibility rules not in compliance with § 1396a(a)(17) simply because those rules attempt to deter fraud. In support of its argument, the Com-

monwealth cites *New York State Department of Social Services v. Dublino,* 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973) (upholding a state rule requiring acceptance of employment as condition to receiving AFDC), and *Lavine v. Milne,* 424 U.S. 577, 96 S.Ct. 1010, 47 L.Ed.2d 249 (1976) (state rule prohibiting welfare payments to persons who quit their employment upheld). But in *Dublino* there was no federal provision inconsistent with the state rule, and in *Lavine* there was no federal provision involved at all, as the benefits were purely a matter of state law. Here the Commonwealth's rule was plainly inconsistent with controlling federal law.

proper procedures. In other words, if, in January, 1972, the state's deeming procedure was impermissible under 42 U.S.C. § 1396a(a)(17), it cannot now be made acceptable simply because of § 209(b). We agree that the purpose of the § 209(b) option was simply to permit the states to assist only those persons whom the states were required to assist prior to the expansion of categorical assistance. Because the "actually available" requirement existed prior to that expansion, we reject any suggestion that § 209(b) authorized the states to continue employing rules that theretofore had conflicted with that requirement.

Because Virginia's transfer of assets rule was not validly in effect as part of its plan on January 1, 1972, it was invalid, as of January 1, 1974, under 42 U.S.C. § 1396a(f), the § 209(b) option. It remained invalid under § 1396a(f) until such time as Congress, by its passage of the Boren-Long Amendment, authorized the states to employ transfer of assets rules notwithstanding § 1396a(f)'s requirement that all rules must have been validly in effect on January 1, 1972.[13] Therefore, the former Virginia rule was invalid at all relevant times: from April 24, 1978, the earliest date for which the statute of limitations for challenging the rule had not expired, until July 1, 1981, the date on which the Boren-Long Amendment authorized Virginia to employ a transfer of assets rule.

The Commonwealth contends that this analysis conflicts with that of the Seventh Circuit in *Synesael v. Ling*, 691 F.2d 1213 (7 Cir.1982). There, Indiana's transfer of assets rule in 1972 had provided that if an applicant transferred property for less than its fair market value within the five years preceding his application for Medicaid, he would be disqualified for a period of two years, or for a period of five years if the amount of uncompensated value exceeded $12,000. The same rule continued in effect after July 1, 1981, the effective date of the Boren-Long Amendment, and plaintiffs argued that continued enforcement of the Indiana rule would violate Boren-Long, 42 U.S.C. § 1396a(j)(1), by being procedurally "more restrictive" than the SSI transfer of assets rule in 42 U.S.C. § 1382b(c). The panel majority, however, found nothing in the legislative history to indicate that Congress, in passing the Boren-Long Amendment, had intended to expand Medicaid eligibility in any state; rather, just the opposite. Therefore, so as to uphold continued use of Indiana's rule, the majority read § 1396a(j)(1) as imposing the new transfer of assets rule only where the client would otherwise have been eligible under the state plan in effect—i.e., only in states that did not already have their own transfer of assets rule in effect.

We do not think that *Synesael* requires the Commonwealth's suggested result. The challenge there was only whether the adoption of Boren-Long prohibited Indiana's continued use of its rule; we deal here with the Virginia rule's validity *prior* to the effective date of Boren-Long. While we recognize that a necessary premise of the *Synesael* majority's decision that the Indiana rule is valid after Boren-Long is an assumption that it also was valid prior to Boren-Long, the majority simply accepted

---

**13.** The revision of 45 C.F.R. § 248.3(b)(1) in 1977, *see* 42 Fed.Reg. 2684, 2686 (1977), to remove the word "actually" from the regulation's requirement that resources be available, did not, therefore, affect the former Virginia rule's invalidity. The rule's invalidity from 1974 on was due to its noncompliance with § 1396a(f), which as we have read it required the state to use only those restrictions lawfully in effect on January 1, 1972. Because Virginia's rule was not validly in effect on that date, only a change in the Act overriding § 1396a(f) could validate the rule. That change did not occur until passage of the Boren-Long Amendment.

*Gray Panthers* does not hold otherwise. It is true that the Court there upheld 1977 HEW regulations permitting liberal deeming of resources in § 209(b) States. But the Court made clear that such deeming had explicitly been authorized by Congress before January 1, 1972, and that such deeming rules had been consistent with § 1396a(a)(17) on that date. The 1977 regulations, therefore, merely served to explicate the law as it had been since 1972, rather than to authorize state rules that were invalid in 1972. *See* 453 U.S. at 44–48, 101 S.Ct. at 2640–2642.

the agreement of the parties that Indiana's rule was valid in 1972. 691 F.2d at 1214–15. The majority did not have argued to it, nor did it analyze, the issue that we think critical: were transfer of assets rules in § 209(b) states valid on January 1, 1972? Because we do not think that an unanalyzed assumption is compelling authority, we decline to follow it when our analysis impels us to a different conclusion.[14]

We thus affirm the district court's judgment that the former Virginia transfer of assets rule was invalid as it was applied to the first class.[15]

### III.

We turn next to the question of whether Virginia's new transfer of assets rule may, consistent with federal law, be applied to persons whose initial applications for Medicaid were filed on or after July 1, 1981, the effective date of both the Boren-Long Amendment and the new rule. The district court upheld the new rule in all respects. Plaintiffs appeal only from the district court's judgment that the new rule's provisions defining the burden of proof on clients to demonstrate that their transfers were not made for unlawful purposes conform to the burden of proof authorized by the Boren-Long Amendment.

Under the Amendment, 42 U.S.C. § 1396a(j)(1), state transfer of assets rules must employ a procedure which is "not more restrictive" than that prescribed for the SSI transfer of assets rule in

§ 1382b(c).[16] That section states that any transfer of an asset for less than its fair market value within the preceding two years "shall be presumed to have been for the purpose of establishing eligibility for benefits or assistance under this chapter unless [the] individual or eligible spouse furnishes convincing evidence to establish that the transaction was exclusively for some other purpose." *Id.* § 1382b(c)(2).

The new Virginia rule provides that, in order to meet this burden, the client must furnish objective evidence of a lawful purpose; a subjective statement of intent or of ignorance of the rule is not sufficient. Further, the client must provide evidence to establish that other resources were available to him, at the time of the transfer, to cover present and expected future medical costs.[17]

In considering the equivalence of these rules, the district court took notice of two federal interpretations of § 1382b(c)'s "convincing evidence" burden. First, the HHS regulations, 46 Fed.Reg. 51,779 (1981), state that "[c]onvincing evidence may be pertinent documentary evidence (for example, legal documents, realtor agreements, relevant correspondence, etc.)." Second, the SSI claims manual requires that the agency investigator take the claimant's statement as to his purpose for making the transfer, attempts to dispose of the asset at fair market value, reasons for accepting less, means or plans for supporting himself after

---

14. Our conclusion on this issue also leads us to disagree with the implications in *Synesael* as to the effect of Boren-Long on the continued use by § 209(b) states of already-existing transfer of assets rules procedurally "more restrictive" than the SSI transfer of assets rule. *See infra* note 16.

15. In regard to this conclusion, what we said in *Fabula,* 598 F.2d at 869, is again pertinent:

> While we sympathize with [the State's] desire to restrict its medical assistance benefits to those most in need, "a State's interest in preserving the fiscal integrity of its welfare program may not be protected by the device of adopting eligibility requirements restricting the class of [individuals] made eligible by federal standards." *Townsend v. Swank,* 404

U.S. 282, 291, 92 S.Ct. 502, 508, 30 L.Ed.2d 448 (1971).

16. It is true that the panel majority in *Synesael v. Ling,* 691 F.2d 1213 (7 Cir.1982), held that § 1396a(j) does not apply to the continued use by § 209(b) states of already-existing transfer of assets rules. But as discussed above, *see* pages 265–266 *supra,* the premise of that conclusion was an assumption that such rules were valid prior to Boren-Long and hence that their use could be "continued." Because our analysis constrains us to disagree with that assumption, and to conclude that Virginia's transfer rule was never valid prior to Boren-Long, we think that § 1396a(j) does apply to Virginia's current rule.

17. *See supra* note 8.

the transfer, relationship to the transferee, and belief that fair market value was received. The investigator is also instructed to request that the claimant submit any pertinent documentary evidence, as well as to gather statements from other individuals if material to the decision. The district court concluded that because the federal agency requires examination of more than a single statement of intent or of ignorance of the transfer of assets rule and indicates that documentary evidence may be significant in meeting the burden of proof, the new Virginia rule is consistent with the agency's interpretation. Therefore, concluding that the new rule's burden of proof provisions are "not more restrictive" than the § 1382b(c)(2) SSI rule's burden provision, the district court approved the new rule.

■ We cannot agree with the district court. Although we concur in its judgment that a single subjective statement of intent will not constitute convincing evidence, we do not read the Virginia rule as stopping there. Rather, the Virginia rule requires documentary evidence in every case. By contrast, both the HHS regulations and the SSI claims manual strongly suggest that although objective evidence is persuasive, it need not be presented in every case. This is reinforced by the language of § 1382b(c)(2), which simply requires that the claimant come forward with "convincing evidence," without demanding from every claimant "objective" convincing evidence.

Moreover, we cannot approve the Virginia rule's requirement that the claimant provide evidence that establishes that other resources were available, at the time of the transfer, to cover present and expected future medical expenses. It is true that the SSI manual instructs investigators to inquire into this question. But that is far less than an ironclad requirement that claimants in each case present objective evidence demonstrating their solvency on the date of the transfer exclusive of the property which is transferred. The high improbability that all of the aged, blind, and disabled at the lowest income levels will be able, regardless

of their purpose in making the transfer, objectively to demonstrate that their resources at the time of the transfer had been sufficient to cover their future medical needs would enable Virginia to disqualify far more of this group than Congress intended. We think that they should not be rendered ineligible if by other credible evidence, short of documentary proof, they can establish that theirs was a lawful purpose. As we think that neither the Act itself nor the agency interpretations require the demonstration insisted on by the new rule, this part of the new rule cannot stand.

We hold therefore that these portions of the new Virginia rule are invalid under 42 U.S.C. § 1396a(j)(1), and may no longer be enforced by the Commonwealth. In addition, we remand this issue to the district court for the fashioning of relief for claimants whose federal rights have been violated by the imposition of this excessive burden of proof.

### IV.

■ We come now to the issue of whether the new rule—apart from the burden of proof provisions which we hold invalid—can lawfully be applied to persons whose initial applications for Medicaid were filed before July 1, 1981, the effective date of the Boren-Long Amendment (and of the new rule). Such persons fall into two classes: (1) those whose initial applications were filed prior to July 1, 1981, but not acted upon until on or after that date; and (2) those who already were receiving Medicaid as of July 1, 1981, and to whom the new rule was applied during an annual eligibility redetermination (i.e., they had transferred assets for less than fair market value while receiving assistance, in order to remain eligible) after that date.

The Boren-Long Amendment, authorizing the application of transfer of assets rules, contained two "effective date" provisions. Section 5(c) of the Amendment specified that the addition of the SSI transfer of assets rule, 42 U.S.C. § 1382b(c), "shall be effective with respect to applications for benefits under title XVI of the Social Se-

curity Act [i.e., SSI] filed on or after" March 1, 1981. Section 2 of the Amendment broadly provided that "[t]he amendments made by this Act shall take effect on, and apply to services furnished on or after, July 1, 1981."

The district court ruled that Virginia cannot apply its new rule, whether as to the initial application or upon redetermination, to any person whose initial application was filed prior to July 1, 1981. The court noted that the SSI transfer of assets rule specifically is to be applied only prospectively to those persons whose applications were (and are) filed on or after March 1, 1981. The court then noted that under 42 U.S.C. § 1396a(f), Virginia as a § 209(b) state cannot apply any eligibility rule more restrictive than those used by SSI unless that state rule was validly in effect on January 1, 1972. Reasoning that this limitation continues to apply, the district court concluded that Virginia can only apply its rule to persons whose initial applications were filed on or after July 1, 1981, in that Virginia otherwise would be applying an eligibility rule more restrictive than SSI.

We think, however, that the Commonwealth may lawfully apply its new rule both as to applications initially filed before, but processed on or after, July 1, 1981, and as to all redeterminations made on or after July 1, 1981. First, the literal language of the Amendment suggests this. The effective date of the provision limiting application of the SSI transfer of assets rule to applications filed on or after March 1, 1981 by its terms applies only to SSI applications. By contrast, section 2 of the Amendment specifies that other changes made by the Amendment will apply to services furnished on or after July 1, 1981. This indicates that Congress intended that in connection with claims for assistance or reimbursement (services) filed on or after July 1, 1981, the states are permitted to apply the new transfer rules, which by their plain terms look back two years. Moreover, a

contrary interpretation would create a grandfathered class of Medicaid recipients, who would not be limited by any restraint in their ability to transfer assets for less than their fair market value in order to remain eligible for assistance.[18]

We disagree, in addition, with the district court's rationale, because we think it clear that when Congress authorized the states to apply transfer of assets rules "[n]otwithstanding any other provision of this title," 42 U.S.C. § 1396a(j)(1), it intended, for purposes of such rules, to exempt states from the requirement in § 1396a(f) that § 209(b) states employ eligibility rules more restrictive than SSI only if those rules were in effect on January 1, 1972. Therefore, while it is true that by applying to persons whose initial applications were filed prior to July 1, 1981, Virginia's rule runs afoul of § 1396a(f) by denying medical assistance to persons eligible for SSI, that transgression is authorized by § 1396a(j)(1). For these reasons, the district court's order granting relief to the second class of plaintiffs is reversed, and Virginia may apply the valid portions of its new rule to that class.

### V.

The Commonwealth also appeals from the district court's order that all members of the first class be given notice that their federal rights were violated, their federal lawsuit had come to an end, and they may attempt to seek reimbursement for past medical expenses through state proceedings. The Commonwealth urges that this order would violate the Eleventh Amendment because no state administrative remedies exist whereby plaintiffs can seek reimbursement for such expenses and because the costs of providing notice would allegedly be substantial.

■ The doctrinal dividing line between relief permissible under the Eleventh Amendment and relief barred by its reservation of sovereign immunity is, in broadest form, that between prospective and retroac-

---

**18.** Such an interpretation would be especially disfavored in the Medicaid laws, because the standards for state Medicaid plans, unlike those for the SSI system, are explicitly required to be comparable for all groups of applicants and recipients. *See* 42 U.S.C. § 1396a(a)(17).

tive relief. In *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court ruled that a federal court may order state officials to conform their future conduct to the requirements of federal law, even though such an injunction may have an ancillary effect on the state treasury. But in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Court held that the Eleventh Amendment bars suits by private parties seeking to impose a liability for the past conduct of state officers that must be paid from public funds in a state treasury.

Between these two poles and most relevant to the present case is *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). There, the district court had ruled that plaintiff applicants' federal rights in a public assistance program had been, and still were being, violated. As part of an order that also included prospective injunctive relief, the lower court required state officials to send a "mere explanatory notice to applicants advising them that there is a state administrative procedure available if they desire to have the state determine whether or not they may be eligible for past benefits." *Id.* at 336, 99 S.Ct. at 1142, quoting 563 F.2d at 875. The Supreme Court rejected the state's argument that this violated the Eleventh Amendment. The Court emphasized that the notice did not purport to impose upon the state any liability for reimbursements; whether or not to do so was left to future state proceedings. Rather, said the Court, "[t]he notice in effect simply informs class members that their federal suit is at an end, that the federal court can provide them with no further relief, and that there are existing state administrative procedures which they may wish to pursue." 440 U.S. at 349, 99 S.Ct. at 1149. The Court's opinion indicates that these existing state remedies may include judicial, as well as administrative, proceedings. *Id.* at 349 & n. 20, 99 S.Ct. at 1149 & n. 20. As such, the Court found that the giving of notice—whose costs of preparation and mailing would be de minimis, *see id.* at 347 n. 19, 99 S.Ct. at 1148 n. 19—was properly viewed as ancillary to the prospective relief already granted by the lower court, rather than as a retroactive award of funds. *Id.* at 349, 99 S.Ct. at 1149.

Virginia argues first that here, unlike in *Quern,* there are no existing state administrative procedures whereby plaintiffs can seek reimbursement for past expenses. We note, however, that under 42 U.S.C. § 1396a(a)(3) the state Medicaid plan must "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied." Under the implementing regulations, 42 C.F.R. § 431.220, this includes any applicant who is denied assistance, as well as any recipient whose assistance is discontinued. And, under 42 C.F.R. § 431.246, "if . . . [t]he hearing decision is favorable to the applicant," then the state "agency must promptly make corrective payments, retroactive to the date an incorrect action was taken." Therefore, all participating states are required to have state procedures whereby applicants and recipients denied assistance may appeal that decision and, if they prevail at the hearing, receive benefits retroactive to the time of the incorrect decision.

The Commonwealth does not deny that it has such procedures. It maintains, however, that under its "Virginia Medical Assistance Program Appeals Procedure" the time limit for requesting such a hearing has expired for every member of the plaintiff class. Under 42 C.F.R. § 431.221, the state must allow a reasonable time for the applicant to request a hearing, but this is not to exceed ninety days from the date of decision. Virginia has chosen, under its appeals procedure, to require requests for hearings to be made within thirty days from the date of decision.

We think that at least two possible avenues of state relief are open. First, the Virginia procedures state that failure to comply with the thirty-day time limit may be excused for good cause shown. We think it possible that the state might construe its own erroneous interpretation of federal law as good cause for the failure of plaintiffs to bring their appeals sooner.

Second, under Virginia law, pecuniary claims against the state may be brought in state court within three years of their disallowance by the responsible agency. Va. Code § 8.01–255. Therefore, many of the claims by members of the first plaintiff class are still within the limitations period for filing in state court. We think that this is sufficient to satisfy *Quern*. First, *Quern* specifically refers to state judicial proceedings to determine reimbursement. 440 U.S. at 349 & n. 20, 99 S.Ct. at 1149 & n. 20. Second, the rationale in *Quern* was that although a federal court cannot order monetary relief for past unconstitutional state conduct, it can, where the state has chosen to provide a remedy for that conduct, require notice to the aggrieved individuals. We think it of no moment that the existing state remedy here may be judicial rather than administrative; in either case the state has voluntarily established a state remedy for its past violations of federal law and it is in the interest of the federal court so to inform the plaintiffs. We therefore conclude that this aspect of *Quern* is satisfied here.

The Commonwealth's second argument is that the district court's order to give notice is barred by the Eleventh Amendment because it would have more than a de minimis effect on the state treasury. We do not think that the state has demonstrated such an effect.[19] As part of the prospective relief, Virginia has been ordered to determine the identity of all members of the first class, so that those members otherwise currently eligible for Medicaid will be declared eligible. This requirement already involves the state in identifying all the class members; thus that part of the cost of giving them notice is already elsewhere required. In addition, some of these people will be determined to be currently eligible. Some notice must be given them of this decision. To enclose the extra information regarding

the past violation of their rights will involve essentially no expense. Under these circumstances, the marginal costs of compliance with the notice order—the costs of printing the notices and of mailing them to persons who would not otherwise receive a mailing as part of prospective relief—have not been shown to be substantial.[20]

In sum, we see no constitutional infirmity in the district court's ordering defendants to give notice to members of the first class whose rights may have been violated both of that fact and of the further fact that these clients may have administrative or judicial redress under Virginia law. We perceive, however, a defect in the notice approved by the district court. That notice advises those to whom it is addressed that the Virginia Department of Welfare is "obligated" to redetermine their *past* eligibility, to reimburse expenses during that earlier period if the person would otherwise have been eligible, and to provide a hearing if disputes arise over the amount of reimbursement due. It is clear, however, that Virginia cannot be "obligated" by federal law to do any of these things, because they involve the mandating of retroactive monetary payments. Instead, the notice simply should explain the rulings of the present case, advise of the case's termination, and explain that the persons will have to look to state administrative or judicial remedies, if any, for possible retroactive reimbursement. It follows that even though we affirm the district court's order that Virginia send notices, on remand the notices must be amended to conform to this opinion.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

DONALD RUSSELL, Circuit Judge, dissenting:

This appeal turns on the resolution of two issues. The first and most important is

---

**19.** We need not, therefore, decide whether the notice would be constitutionally impermissible if its costs were substantial.

**20.** We do not, of course, here decide the permissibility of notice (or any other) relief for the second and third plaintiff classes injured by

erroneous eligibility determinations based on the new Virginia rule's excessive burden of proof provisions; such relief is to be fashioned in the first instance by the district court on remand.

whether Virginia, as a "§ 209(b)" participating State under the federal Medicaid program adopted as a part of the Social Security Act of 1965, was entitled, prior to the effective date of the Boren-Long Amendment in 1980,[1] to enforce its transfer of assets rule, which was a part of its approved participating Medicaid plan, as of January 1, 1972. The majority's answer to this question is that Virginia could not because the rule conflicts with the proper construction of the provisions of the initial federal statute for state participation in the program and with the regulations of the Secretary of Health and Human Services (Secretary) issued thereunder. I disagree.

In *Schweiker v. Gray Panthers*, 453 U.S. 34, 43–44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981), the Supreme Court stated the principles to guide courts in the construction and application of the statutory authorization for the Medicaid program. In that connection, it said that because of the "byzantine construction" of the statute creating such program, which was "among the most intricate ever drafted by Congress," Congress had "conferred on the Secretary exceptionally broad authority to prescribe standards" as provided for in the statute and to define statutory "terms," an authority which, when exercised, was to be given, as it were, " 'legislative effect' " and, in particular, it " 'entrust[ed] to the Secretary, rather than to the courts, the primary responsibility for interpreting the statutory term,' " including in particular the term " 'available' " as used in the federal statute to designate for Medicaid eligibility thereunder.[2]

The federal statute creating this Medicaid program contemplated joint federal and state participation. In order to induce state participation, the federal government offered to make grants to participating states which submitted plans conforming to the standards fixed in the federal statute by the Congress and had been approved as so conforming, by the Secretary. § 1396, 42 U.S.C. Virginia submitted such a proposed plan shortly after the statute was enacted. Included in that plan was a transfer of assets provision under which any applicant or recipient who transferred property for less than its fair market value for the purpose of obtaining Medicaid coverage was ineligible for participation in the program for a period of one year, subject to certain exceptions.[3] This provision was similar to plans submitted by many other states. The Secretary perceived in such provisions, manifestly designed to frustrate abuse of the program, nothing at variance with the broad purposes of the Act or its language if given the pragmatic interpretation intended by Congress, or with his regulations. It accordingly from the beginning of the program approved such provisions as valid and made grants under the Act to the states submitting plans which included such provisions.[4]

In 1972, Congress contemplated, in the course of replacing certain of the categorical assistance programs with what was known as the Supplementary Security Income (SSI) program, to change Medicaid eligibility to parallel SSI rules of eligibility. Congress feared, however, that, if this were done uniformly the burden in the case of

1. Pub.L. No. 96–611, § 5, 94 Stat. 3567 (1980), codified at 42 U.S.C. §§ 1382b(c) and 1396a(j).

2. In line with this recognition of the interpretative authority having a "legislative effect" vested in the Secretary, the Supreme Court in *Gray Panthers* held that "resources" which could be considered "available" to an applicant might be "*deemed*" to include "resources" which were "available" to the applicant's spouse.

3. The provision as of January 1, 1972, is set forth in the majority opinion in note 4.

4. In *Fabula v. Buck*, 598 F.2d 869, 878 (4th Cir.1979), we said that the approval of a state

plan would, in that case, be but "slightly persuasive" on the validity of the plan but it said that because, as we were careful to observe, such approval was "in the face of the agency's clear statements to the contrary." In this case, however, the Secretary has consistently taken the position that a "§ 209(b)" state might validly enforce a transfer of assets provision prior to the adoption of the Boren-Long Amendment. This "clear" action of the Secretary over a long period of time gives to the construction of the statute urged by the State and the Secretary considerable "persuasiveness" in this case.

those states with approved Medicaid plans less favorable to recipients than the SSI standards would induce many to withdraw with serious consequences for the program. Accordingly, Congress proceeded in the amendment to the Act, adopted at that time, to give "the states an option to limit Medicaid assistance to people who would have been eligible under the state's plan that was in effect on January 1 of that year (1972)." *Synesael v. Ling*, 691 F.2d 1213, 1214 (7th Cir.1982). In effect, by this amendment Congress represented to the states, as an inducement to remain as a participant in the program, that any state, at its option, could elect, rather than following the SSI schedule of benefits, to retain its limits on benefits established by its plan to recipients of Medicaid assistance as set forth in its approved plan in effect on January 1, 1972, *including by necessary implication its transfer of assets provisions.* The states exercising such option were known as "Section 209(b)" states; those states, on the other hand, which elected to accept the broad SSI coverage, were known as "SSI" states. Virginia was one of almost half the states which elected to become a "Section 209(b)" state, accepting Congress' assurances that it was thereby limiting its burden by the provisions of its approved plan in effect on January 1, 1972. Thus, until the effective date of the Boren-Long Amendment to the Act in 1981, the participating states under the Medicaid program were divided into two classes, one, "Section 209(b)" states, and, two, "SSI" states, in which the provisions for assistance were expected to be different. During all of this period Virginia was a "Section 209(b)" state, operating under its approved plan in effect on January 1, 1972 with the transfer of assets provision.

After the adoption of this amendment creating the two classes of participating states, the Secretary recognized that "Section 209(b)" states, such as Virginia, could, unlike the "SSI" states, follow their approved plan of benefits in effect on January 1, 1972, including their transfer of assets provision, and continue to receive grants under the statute as a conforming state.

The Secretary has never apparently departed from this position and he is before this Court in this case asserting the right of "§ 209(b)" states, such as Virginia, to enforce, prior to the effective date of the Boren-Long Amendment, their transfer of assets provisions if such provisions were a part of their approved plan on January 1, 1972.

Moreover, Congress itself knew of and implicitly approved of the Secretary's application and interpretation of the amendment. It violates common sense to assume that Congress was unaware throughout the '70s that "§ 209(b)" states were applying transfer of assets limitations, although "SSI" states were forbidden to do so by the amendment of 1972. Any doubt on this point is dissipated by the legislative history leading up to the Boren-Long Amendment itself. In 1980 the reports of the various Congressional Committees, particularly that set forth on pp. 5596–97, U.S.Code Cong. & Admin.News, 96th Cong., 2d Sess., (1980), show beyond question that Congress was completely aware of this difference between the "SSI" states and the "§ 209(b)" states in connection with the authority to provide against transfer of assets and that it (Congress) approved of such difference as within Congressional intendment. Beyond this, the Supreme Court has recognized the difference in authority in this area between "§ 209(b)" states and "SSI" states. In *Gray Panthers* it said: "States exercising the § 209(b) option were required to adopt a 'spend down' provision." (453 U.S. at 39, n. 5, 101 S.Ct. at 2638, n. 5) Later, in *Schweiker v. Hogan,* 457 U.S. 569, 581, n. 18, 102 S.Ct. 2597, 2605, n. 18, 73 L.Ed.2d 227, 237, n. 18, the Supreme Court restated what it had said in *Gray Panthers* in this regard:

"Since recipients of categorical welfare assistance are also entitled to Medicaid benefits, the expansion of general welfare accomplished by the SSI program increased Medicaid obligations for some States. To guarantee that States would not, for that reason, withdraw from the Medicaid program, Congress offered what

has become known as the '§ 209(b) option.' Under it, States may elect to provide Medicaid assistance only to those individuals who would have been eligible under the state Medicaid plan in effect on January 1, 1972. . . . Thus, in some States, Medicaid is not automatically available for all of the 'categorically needy.' "

To summarize: (1) The Secretary, to whom the authority to interpret this statute was delegated under what the Supreme Court has characterized as an "exceptionally broad authority," has consistently and does now assert that "§ 209(b)" states had absolutely valid authority prior to the effective date of Boren-Long to have their own transfer of assets rule in their plan of Medicaid assistance; (2) Congress was aware of this construction of the statute by the Secretary and implicitly approved of it as a proper application of what it intended by the 1972 amendment; (3) And, as I read *Gray Panthers* and *Hogan,* both, in my opinion, read the authority of the Secretary and the effect of the 1972 amendment as sustaining the right of "§ 209(b)" states, prior to the Boren-Long Amendment, to enforce a transfer of assets rule.

The majority, however, disagrees. It concedes, as I read the majority opinion, that Congress by the amendment of 1972 created two classes of participating states under the federal Medicaid program, *i.e.,* the "§ 209(b)" class and the "SSI" class. It recognizes, I think, that Congress intended to make a distinction in what might be contained in the plan of the two classes: A "SSI" state was bound strictly to the limitations on benefits stated in the statute but a "§ 209(b)" state could be more flexible in its limitations on benefits, fixing its limitations or restrictions by what was a part of its plan, as approved by the Secretary, in effect on January 1, 1972. It is at this point, though, that the majority would add what I regard as an untenable qualification upon the right of a "§ 209(b)" state. Under its construction of the statute, a "§ 209(b)" state might not include in its plan any denial of participation in benefits in the plan which takes into account "re-

sources" not "available" in hand to the applicant at the time of his application. This, it holds, is the inescapable result of § 1396a of the original statute. Under this construction, it would hold that, irrespective of whether a transfer of assets provision be deemed a standard of eligibility or an anti-fraud provision, such a provision was invalid prior to the enactment of Boren-Long.

I disagree with this strict and inflexible construction of the statute. I do not tarry over the exact identification of a transfer of assets provision as a standard of eligibility or as an anti-fraud provision. I would find the provision valid in either circumstance, even though I think it is more properly considered an anti-fraud provision. The suggestion that *Fabula v. Buck,* 598 F.2d 869 (4th Cir.1979) brands the provision with invalidity if deemed an anti-fraud statute is, I suggest, unsound. *Fabula* dealt with a "SSI" state and the Secretary had long ruled after the 1972 amendment that a "SSI" state, as contrasted with a "§ 209(b)" state, could not include a transfer of assets provision in its plan. We held in *Fabula* —and this was the rationale of the decision—that "these administrative interpretations [by the Secretary] are reasonable and consistent with the statute, and are entitled to be followed by the courts." *Id.,* at 873. But, in the case of a "§ 209(b)" state, on the other hand, the Secretary has equally consistently taken the position that a transfer of assets provision was, until the effective date of the Boren-Long Amendment, a valid part of the state plan. Accordingly, if we follow the rationale of *Fabula,* that ruling of the Secretary with reference to a "§ 209(b)" state such as Virginia is "entitled to be followed by the courts," especially in the light of the rule of construction of the statute as stated by the Supreme Court in *Gray Panthers.* If, on the other hand, the provision is to be regarded as controlled by the term "available," then the Secretary had the authority to include within the term "available" anything that could reasonably have been "deemed" "available" under the decision in *Gray Panthers,* which was decided subsequently to *Fabula.* I find

nothing irrational in treating as a part of an applicant's "resources," assets which the applicant, in order to induce the Government to provide him with free medical attention on the representation that he was without "resources," had transferred his property to his children without consideration. I perceive little difference between such assets so transferred and assets which have been concealed or sequestered; in either instance, I think it reasonable to regard the assets as "available." Above and beyond this is the fact that, as already observed, under the 1972 amendment, Congress and the Secretary have both made a distinction between "SSI" states and "§ 209(b)" states but the majority opinion would, in disregard of that manifest purpose, eliminate that distinction.

I respectfully suggest, with all deference for the contrary views of the majority, that it (the majority), in declaring by its ruling that the rights of "§ 209(b)" and "SSI" states were identical in their limitations on benefits, is actually contradicting the representation made by Congress in its 1972 amendment that any provision limiting benefits which a state had in its plan in effect on January 1, 1972, would be permitted to continue if the state elected to become what was known as a "§ 209(b)" state. Frankly, I do not think Congress when it enacted the 1972 amendment, was engaging in a "shell game" of cleverly representing to states with transfer of assets provisions in their plans that they could, by exercising their option under § 209(b), continue to follow such provisions as were in effect in their participating plans on January 1, 1972, while concealing from them at the same time that such representation was valueless since its enforceability of the representation was invalid under the narrow construction of § 1396a, adopted by the majority. I repeat that it is my considered opinion that Congress, in its 1972 amendment, was telling in good faith any state whose existing participating plan had been approved by the Secretary as conforming with statutory standards that it could legally continue at its option to follow that plan, and it did not intend for any court in 1983 to invalidate provisions in a state plan which for more than a decade the Secretary, with the tacit approval of Congress, had found to be valid under the statute. Such action is, in effect, contrary to Congressional intent, as found in *Gray Panthers* that it was the Secretary and not the courts, to whom the Congress entrusted the authority to define the terms under the statute and to construe its provisions.

It follows that, under the above reasoning, I, unlike the majority would reverse the ruling of the District Court that the enforcement of Virginia's transfer of assets provision in its plan of participation in the Medicaid program prior to the effective date of the Boren-Long Amendment was invalid. Such a result, which follows generally the reasoning in *Synesael v. Ling, supra,* would render inappropriate all the remedial provisions of the District Court's judgment based on the assumed invalidity of the state's transfer of assets provision in existence prior to the effective date of the Boren-Long Amendment. This would leave for decision the challenge to the Virginia transfer of assets provisions in its plan of participation, as amended to conform to the requirements of the Boren-Long Amendment. Such challenge presents the second issue in this appeal.

The second issue in this case is the validity of Virginia's amended plan, as approved by the Secretary in compliance with the statute as amended. The District Court found such amended plan valid. The majority opinion finds it, in part, invalid. I again disagree. I would affirm the result on this issue reached by the District Court for the reasons assigned by it.